IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GRAY LOCAL MEDIA, INC., a
Delaware corporation,

        Plaintiff,

    v.

SCHMIDT PROPERTY
MANAGEMENT, LLC, an Oregon
Limited Liability Company,

        Defendant.

Case No. 3:24-cv-1504-SI

OPINION AND ORDER

Julie R. Vacura and Elizabeth E. Parker, LARKINS VACURA KAYSER LLP, 121 SW Morrison
Street, Suite 700, Portland, OR 97204. Of Attorneys for Plaintiff.

Christopher G. Lundberg and Matthew E. Malmsheimer, HAGLUND KELLEY LLP,
2177 SW Broadway, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

       This contract dispute between Plaintiff, Gray Local Media, Inc. ("Gray"), and Defendant,

Schmidt Property Management, LLC ("Schmidt"), concerns a broadcast tower that Gray owns

but sits on land leased from Schmidt. Among other agreements between the parties, they signed a

contract requiring Gray to make certain repairs to the tower and then transfer ownership of the

tower to Schmidt, at which point the underlying lease will end. Now before the Court is Gray's

PAGE 1 – OPINION AND ORDER

Motion for Partial Summary Judgment on its equitable claim for specific performance, ECF 51. In that claim, Gray seeks an order compelling Schmidt to take possession of the Tower. Gray's other claims and Defendant's counterclaims are scheduled for trial commencing on June 22, 2026. For the reasons explained below, the Court denies Gray's Motion for Partial Summary Judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

On or about August 22, 1981, the predecessors of Gray and Schmidt entered into a lease of real property. Under that lease, Schmidt's predecessor allowed Gray's predecessor to build, operate, and maintain a broadcast tower ("Tower") on land owned by Schmdt's predecessor. ECF 53 (Hanson Decl.), Ex. 1. The underlying lease has been amended several times. *Id*. On February 20, 2023, the parties signed a Memorandum of Understanding ("MOU"), which defined their respective rights and obligations concerning the termination of the lease. ECF 53, Ex. 10. On June 22, 2023, the parties supplemented the MOU with a "Side Letter." ECF 53, Ex. 11. Both the MOU and the Side Letter are binding on the parties. *See* ECF 51 at 6; ECF 52 (Calleros Decl.), Ex. 1 ¶ 69, Ex. 2 at 2-3.

Together, the MOU and Side Letter reflect the parties' agreement that the Tower remain in place and that Gray make certain payments and repairs before transferring ownership of the Tower and an associated transmission building to Schmidt at the termination of the lease. *See* ECF 53, Exs. 10 and 11. The MOU obligates Gray to pay Schmidt a total of $500,000, with $100,000 due within 30 days of signing the MOU and the balance of $400,000 to be paid not

later than final transfer. Gray has made both payments, and Schmidt has accepted both payments. In addition, the MOU requires Gray to perform certain repairs at its own expense subject to certain contractor approval rights by Schmidt. These repairs include:

- repairing damaged (or bent) "members" of the Tower;[1]

- painting the Tower to industry standards;

- installing a new lighting system and lighting controller;

- performing a complete "plumb and tension" of the Tower;

- removing certain antennae and appurtenances as requested by Schmidt;

- repairing the "ice bridge" on the property;

- inspecting and repairing the building's mechanical systems, removing any systems that are beyond repair, and removing any banned refrigerant;

- performing certain servicing and load testing on the facility's diesel generator;

- repairing the road located on the property; and

- removing all trash and defunct broadcasting equipment.

ECF 53, Ex. 10. The parties also agreed "to accept the work of each contractor . . . once the contractor has certified that his/her/its work has been completed to industry standard." *Id*.

The Side Letter imposed additional requirements on the parties, committing them each to contribute financially to road maintenance for ten years, directing Gray to seek to narrow its access easement on the property from 60 to 40 feet, and allowing Gray to erect certain new

---

[1] For the purposes of this Opinion and Order, the Court assumes that a "member" of a tower is a structural component—typically made of steel angle profiles—that constitutes the individual pieces of a lattice structure, including legs, braces, and horizontal supports. These components are designed to carry axial tension or compression loads, bracing the structure to increase its load-bearing capacity and stability. If the Court's understanding is incorrect, the parties are invited to provide a more accurate description.

PAGE 4 – OPINION AND ORDER

fencing, use a turnaround on the property, and install a new gate on the property. ECF 53, Ex. 11. Upon satisfactory completion of the work and obligations described in the MOU, that agreement provided that the lease would terminate and ownership of the Tower and building would transfer to Schmidt. ECF 53, Ex. 10. Neither the MOU nor the Side Letter contain an integration clause.

Throughout the repair process, the parties engaged in numerous conversations and correspondence. Schmidt characterizes some of these communications as "oral agreements" that supplemented or amended the MOU and Side Letter. ECF 57 at 9; ECF 59 (Schmidt Decl.) ¶ 18. Gray, however, disputes that characterization. These communications include:

- On May 12, 2023, Mr. Peter Buxton, Gray's Director of Engineering, sent an email to Schmidt discussing an upcoming inspection of the Tower and grounds and stating that "repairs will be made based on that study as we agreed." ECF 59-3 at 1.

- Gray allegedly agreed "to repair the roof above the lower breezeway of the Transmitter building, inspect all of the emergency back-up system (fuel tanks to transfer switch) and perform a full load test of the generator (stress test of the generator's capacity), ensure the grounding and lightning protection for the Tower and Site are adequate, and provide [Schmidt] continued access to fiber cable via the fiber IRU for the Tower following the transfer of ownership to SPM." ECF 59 ¶ 25.

On August 19, 2024, Gray sent a letter to Schmidt, stating that Gray had finished all work required under the MOU and Side Letter, attaching several "certifications" from contractors, and notifying Schmidt that the remaining $400,000 payment would be delivered shortly. ECF 54 (Joslin Decl.), Exs. 1 and 2. Gray also calculated the total costs of the repairs made at $1,112,554.76. ECF 53 ¶ 15. Schmidt responded the same day, refusing to take ownership of the Tower, alleging that Gray had failed to meet the terms of the MOU and Side Letter, and asserting that Gray was in breach of those agreements. ECF 54, Ex. 3. Schmidt, however, received and deposited the remaining $400,000 payment, on top of the previously received and deposited $100,000. *See* ECF 52, Ex. 3 at 29:21-30:6; ECF 53, Ex. 12.

PAGE 5 – OPINION AND ORDER

**DISCUSSION**

Gray seeks summary judgment on its claim for specific performance, making two alternative arguments. First, Gray contends that any breaches by Gray of the lease, MOU, or Side Letter are not material and thus do not discharge Schmidt of its obligation to perform. ECF 51 at 11-15. Second, Gray asserts in the alternative that, even Gray did materially breach the MOU, Schmidt nevertheless accepted Gray's performance by accepting the $500,000 payment, which obligates Schmidt to perform its contractual obligations. *Id*. Schmidt responds that Gray's breaches were material and offers a long list of what Schmidt contends are material deficiencies. ECF 57 at 10-16. Schmidt also asserts that it never accepted Gray's deficient performance under the MOU, even though Schmidt does not deny accepting and depositing Gray's $500,000 payment. *Id*. at 20-25.[2]

**A.  Whether Gray's Alleged Breaches Are Material**

"It is a general rule of equitable jurisprudence that a plaintiff coming into equity for specific performance must show not only that he has a valid, legally enforceable contract, but also that he has complied with its terms by performing or offering to perform on his part the acts which formed the consideration of the undertaking on the part of the defendant." *Percy v. Miller*, 197 Or. 230, 239-40 (1952).[3] However, "[l]iteral and exact performance by a plaintiff is not always necessary as a condition to securing specific performance of a contract by defendant." *Id*.

---

[2] Schmidt also contends that Gray has "unclean hands" with respect to its performance under the MOU and thus is not entitled to specific performance. ECF 57 at 29-30. Because the Court concludes that there are genuine issues for trial regarding whether Gray's breaches are material and whether Schmidt has accepted Gray's allegedly deficient performance, the Court need not address Schmidt's unclean hands defense at this stage of the litigation.

[3] "A federal court sitting in diversity applies the substantive law of the state." *Albano v. Shea Homes Lt. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011). The parties agree that Oregon law governs this dispute.

at 240. Specific performance may be granted if a plaintiff's failure to perform is "related to some more or less minor matter." *Id*. Thus, "[a]n immaterial breach by one party does not operate to discharge an obligation by the other party." *Reeder v. Kay*, 282 Or. 191, 194 (1978). *See also Naftzger v. Henneman*, 94 Or. 109, 117 (1919) ("Every slight or partial dereliction of one party will not entitle the other to abrogate the contract.").

"A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement." *Johnstone v. Zimmer*, 191 Or. App. 26, 34 (2003) (citing *Crain v. Segel*, 151 Or. App. 567, 572 (1997). "Whether a breach is material is ordinarily a question of fact for the jury," but "[i]t is possible for a breach to be material as a matter of law if the uncontested evidence is consistent only with the idea of a material breach." *Commerce Mortg. Co. v. Industrial Park Co.*, 101 Or. App. 345, 349 (1990) (citing *Wasserburger v. Amer. Sci. Chem.*, 267 Or. 77, 82 (1973), and *McDuffy, Edwards & Assocs. v. Peripheral Systems*, 93 Or. App. 226 (1988)). Thus, Gray's motion can succeed if the uncontested evidence is consistent only with the conclusion that each of Gray's alleged breaches is immaterial.[4]

Schmidt has presented evidence regarding a long list of alleged material breaches by Gray. If at least one raises a genuine issue of material breach, the Court need not consider all of them. Among other alleged material breaches, Schmidt contends that Gray breached its

---

[4] Gray argues that the standard applied to its motion should be lower because the suit is in equity. "It is well established, however, that suits in equity, including suits for specific performance of contracts, are ordinarily to be tried to a court without a jury and that the constitutional right to trial by jury does not apply to suits in equity." *Phillips v. Johnson*, 266 Or. 544, 549 (1973). But this does not change the standard at summary judgment under Rule 56 of the Federal Rules of Civil Procedure. If there is a genuine dispute of material fact, then the issue is inappropriate for resolution on summary judgment, regardless of whether the factfinder is a judge or a jury.

obligation to repair the damaged members of the Tower, as required by the MOU. Gray's corporate representative testified that 20 to 30 members needed repair. ECF 58 (Colley Decl.), Ex. 6 at 47:7-12. Schmidt adds that it never received any documentation showing that Gray's contractors had repaired 20 to 30 members. ECF 59 ¶ 40. Moreover, Gray has not provided the Court with any signed certification from any contractor showing that these repairs were completed to industry standards, as the MOU requires before Schmidt must accept performance.

Gray provided contractor certifications confirming completion of work to industry standards for removal of electrical equipment; removal, installation, and repair of fencing; installation of lighting; removal of broadcasting equipment; labeling of transmission lines; paving the road and other grounds maintenance; and ice shield repair and replacement. ECF 54, Ex. 2 at 7-8, 13-15. In addition, Gray provided a contractor certification form for the damaged members of the Tower, but it is incomplete, failing to state or confirm that the repair work has been completed. *See id.* at 9-12. Unlike the other certificates, it contains no date on which any work was performed, from which it is a reasonable inference that the work has not yet been performed. *Id*. at 9. Moreover, although the certificate identifies several maintenance issues with respect to the damaged members, rather than describing what was done to resolve those issues as the other certificates do, the form merely recommends *future* remedial actions. *Id*. at 9-12.

The record also contains a proposal for Tower maintenance from Schmidt's preferred and approved contractor, Electronics Research, Inc., that lists identified maintenance issues with the Tower members and estimates the cost of repair. *Id*. at 29-31. This documentation, however, is not evidence that the necessary repair work has been done, let alone performed to industry standards.

PAGE 8 – OPINION AND ORDER

Finally, damaged members on a communications tower are not immaterial. They are integral to the structural integrity of the Tower and, thus, to Schmidt's ability safely and profitably to use the Power. Schmidt's objective in the parties' bargain was to take possession of a fully repaired Tower so that it could operate the Tower safely with hopes of making a reasonable profit. *See* ECF 57 at 4, 6-7, 16, 22 ("The heart and substance of the bargain between the parties is simple: Gray Media would not be obligated to remove the Tower, and SPM would accept possession of the Tower after it had been fully repaired."). Thus, even if this were the only material breach about which Schmidt has shown a genuine issue for trial, that would be enough to deny Gray's motion based on its first argument. The Court turns next to Gray's alternative argument.

**B.  Whether Schmidt's Acceptance of Payment Is Acceptance of Deficient Performance**

Gray's alternative argument, in essence, states that, under Oregon case law, Schmidt's acceptance of Gray's $500,000 payment also constitutes acceptance of Gray's deficient performance, which under the MOU obligates Schmidt to perform. ECF 51 at 11-15. The express provision of the MOU upon which Gray relies, however, relates to acceptance of the contractors' work. That term states: "The parties agree to accept the work that each contractor . . . is engaged to do once the contractor certifies that his/her/its work has been completed to industry standard." ECF 53, Ex. 10 at 2. As discussed above, there is nothing in the record showing that Gray ever provided such certification with respect to one of the most structurally important repairs required under the MOU—repair of the damaged members of the Tower. Thus, with respect to this provision of the MOU, Schmidt could not have accepted Gray's repair performance because Gray has not appeared to perform.

The damaged members of the Tower are not the only example of Gray's material nonperformance. Gray has provided no certification showing that the required "plumb and

PAGE 9 – OPINION AND ORDER

tension" has been performed. The record appears to show only a "proposal" regarding its future performance. ECF 54, Ex. 2 at 31. Additionally, the record contains a proposal for new paint on the Tower and a warranty for the paint, possibly indicating that the Tower has been painted. *See id.* at 31, 54. But there is no certificate showing that the Tower was painted to industry standards. Finally, there is nothing in the record showing that Gray had repaired the ice bridge to industry standards.[5] All of these repairs were required under the MOU, and Gray does not appear to have delivered to Schmidt any certification that the work was completed to industry standards. Thus, under the express terms of the MOU, Schmidt was not required to accept that work.

Instead, Gray argues that by accepting the $500,000 payment, which Gray calls "partial performance," Schmidt, as a matter of law, has accepted Gray's performance under the contract and Schmidt's only remedy is a claim for monetary damages for less than complete performance. Gray relies on three Oregon cases in support of its argument, but each is distinguishable and ultimately unhelpful to Gray.

Gray cites *Smith v. Hickey*, 45 Or. App. 139 (1980). In that case, the plaintiff leased real property from the defendant. The lease, signed in 1974, gave the plaintiff the option to purchase the property and included a requirement that the plaintiff pay all property taxes. *Id*. at 141. In 1978, the defendant received a foreclosure notice based on unpaid property taxes. *Id*. The defendant paid the property taxes, did *not* notify the plaintiff of that deficiency, and continued to accept rent from the plaintiff. *Id*. Several months later, the plaintiff attempted to exercise his option to purchase the property. *Id.* at 141-42. The defendant attempted to introduce new costs to the option price not originally included in the contract, and the plaintiff sued for specific

---

[5] As previously noted, the Court's discussion of these examples should not be construed as any finding of satisfactory performance of any item of alleged material breach that the Court has not expressly mentioned.

PAGE 10 – OPINION AND ORDER

performance. *Id*. The trial court ruled for the defendant on the grounds that the plaintiff had breached the contract by failing to pay property taxes and that the defendant had not waived that breach. *Id*. The Oregon Court of Appeals reversed, holding that "[w]hen defendant learned of the nonpayment of taxes, he had an election either to terminate the lease on account of the breach or to waive his right to terminate and continue the agreement in full force" and that "[b]y failing to notify plaintiff of the breach and by continuing to accept rent from plaintiff, defendant elected to continue the lease agreement." *Id*. at 142-43. The court concluded that the lease agreement was still in full force and effect, and the defendant was required to honor its provision granting the plaintiff an irrevocable option.

Smith is inapposite to the pending dispute. The Oregon Court of Appeals based its decision in part on the fact that the defendant never notified the plaintiff of the plaintiff's breach and continued to accept rent, thus electing to continue with the contract. Here, viewing the facts in the light most favorable to the non-moving party, Schmidt timely and clearly told Gray that the repairs on the Tower were inadequate and incomplete and that Gray's documentation of those repairs to not meet the express terms of the MOU.

Under *Smith*, Schmidt's acceptance of Gray's $500,000 shows nothing more than Schmidt's willingness to have the parties perform under the terms of their agreement. It does not, in any way, reflect an acceptance of Gray's alleged materially deficient performance. *Smith* involved the question of whether the defendant could cancel an otherwise irrevocable option agreement, and the court held that the defendant could not do that based the defendant's failure to provide timely notice to the plaintiff and the defendant's continued acceptance of the plaintiff's rent. Thus, *Smith* does not help Gray in the pending dispute.

Gray also relies on *Lincoln County v. Fischer*, 216 Or. 421 (1959). In *Fischer*, private parties contracted to buy real property from a county by making installment payments. The contract included a "time of the essence" clause. *Id*. at 426. The private parties and their assignee failed to make the required installment payments for eight years. *Id*. The private parties, however, continued to pay the county all property taxes owed on the land. *Id*. at 426-27. Further, immediately upon discovery of the nonpayment of the past-due installment obligations, the purchaser's assignee paid the balance in full, which the county accepted. *Id*. at 426. Notwithstanding that acceptance, the county brought an action to quiet title in the land, and the purchaser's assignee counterclaimed for specific performance. *Id*. at 426-27. The trial court entered judgment against the purchasers and their assignee, and they appealed. The Oregon Supreme Court reversed the trial court and granted specific performance.

In granting specific performance to the assignee, the Oregon Supreme Court, quoting a Missouri case, explained that "equity may decree a specific performance of a contract for the sale of property, notwithstanding a default in payment upon the day specified," when supported by equitable principles, such as:

> where the purchaser has gone into possession and made valuable improvements or paid a considerable portion of the purchase money, or the default is occasioned by the act of the vendor, or he has waived it by receiving part of the purchase money, or otherwise, or where any other circumstances exist that would render a forfeiture inequitable.

*Id*. at 439-40 (quoting *O'Fallon v. Kennerly*, 45 Mo. 124, 127-28 (1869)). The Oregon Supreme Court also noted that the county would suffer no prejudice or hardship if required to perform because it would still receive the bargained-for benefit of the contract. *Id*. at 448.

Here, again, the instant case is distinguishable. Unlike the purchaser's assignee in *Lincoln County*, who fulfilled all material terms of the contract in that case, albeit belatedly, viewing the

facts in the light most favorable to Schmidt, it appears that Gray has yet to provide the repair performance that is required under the MOU. Further, Gray provides no authority for the proposition that, by accepting the payment terms due under the MOU, Schmidt somehow waived its right to receive the benefit of the MOU's repair terms, which are needed for Schmidt to safely and profitably operate the Tower. Thus, the Court cannot conclude as a matter of law that Schmidt has received the benefit of the contract, unlike the situation in *Lincoln County*.

Finally, in *Lemley v. Lemley*, 221 Or. App. 172 (2008), a husband filed suit against his wife to force compliance with a divorce settlement. The wife argued that her attorney lacked authority to agree to the settlement. *Id*. at 180-81. The trial court entered judgment for the wife, and the husband appealed. The Oregon Court of Appeals reversed, holding that the wife had "acted consistently with the proposition that [her attorney] possessed full authority" to enter into the agreement and because the wife accepted the benefits of that agreement with full knowledge of the agreement; that was enough to show agency authority by the wife's lawyer. *Id*. at 186-87.

Again, the facts in *Lemley* are distinguishable from the facts here. First, the question at issue in Lemley was whether the wife's attorney acted with agency authority. That issue, however, has no application here. Further, as previously discussed, Gray provides no authority for the proposition that, by accepting the payment terms due under the MOU, Schmidt waived its right to receive the benefit of MOU's repair terms.

Gray's three cases essentially show that when one party has breached but substantially performed its obligations under a contract and where the failure of the second party to perform would violate principles of equity, specific performance may be an appropriate remedy. Here, however, there is a genuine issue of material fact whether Gray has substantially (or materially) performed its repair obligations under the relevant documents, namely the MOU and Side Letter.

PAGE 13 – OPINION AND ORDER

If Gray has not, equity would not likely support Gray's request for specific performance, although equity would also require an appropriate accounting of the $500,000 that Gray has paid and Schmidt has accepted. Therefore, although it is true that "[l]iteral and exact performance by plaintiff is not always necessary as a condition of securing specific performance of a contract," *Smith*, 45 Or. App. at 143 (citing *Percy*, 197 Or. at 240), the Court will not require specific performance by Schmidt at this stage of the litigation, where factual disputes exist regarding whether Gray has substantially (or materially) performed its repair-related obligations.

## CONCLUSION

The Court DENIES Plaintiff's Motion for Partial Summary Judgment, ECF 51.

**IT IS SO ORDERED.**

DATED this 28th day of April, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 14 – OPINION AND ORDER